**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Public Interest Legal Foundation Incorporated,

    Plaintiff,

v.

Adrian Fontes,

    Defendant.

No. CV-25-02722-PHX-MTL

**ORDER**

  "Sunlight is said to be the best of disinfectants" for honest elections. *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per curiam) (quoting Louis D. Brandeis, *Other People's Money* 62 (1933)). Congress embraced that principle in the National Voter Registration Act ("NVRA") by requiring public access to records bearing on how states maintain their voter rolls to bolster electoral integrity and voter participation. This case concerns the scope of that disclosure mandate.

  Before the Court is Defendant Arizona Secretary of State Adrian Fontes's Motion to Dismiss (Doc. 15), challenging both Plaintiff's standing and the legal sufficiency of the claims. The Court will deny the Motion.

## I. BACKGROUND

  Congress enacted the NVRA to promote voter participation and to protect the integrity of federal elections through accurate and current voter registration rolls. *See* 52 U.S.C. § 20501(b). Section 8 of the NVRA governs list maintenance and directs states to administer voter-registration lists to ensure eligible voters remain registered while

permitting removal of ineligible registrants through specified mechanisms, including reasonable programs to remove registrants who are no longer eligible due to death or a change in residence. *See id.* § 20507(a)(4). To facilitate public oversight of those list-maintenance activities, the NVRA requires states to "maintain for at least 2 years" and make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," subject to limited exceptions. *Id.* § 20507(i)(1) ("NVRA § 8(i)").

The NVRA authorizes private enforcement of these requirements. Before filing suit, an aggrieved person must provide written notice to the state's chief election official and afford an opportunity to cure. *See id.* § 20510(b). If the alleged violation is not corrected within the statutory period, the NVRA permits a civil action for declaratory and injunctive relief. *See id.* § 20510(b)(2).

Plaintiff, the Public Interest Legal Foundation (the "Foundation"), is a Virginia non-partisan nonprofit organization that regularly seeks voter-list maintenance records under the NVRA to evaluate state compliance and support its research and public-education activities. (Doc. 1 ¶ 4.) Secretary Fontes (the "Secretary") is responsible for coordinating Arizona's responsibilities under the NVRA. (*Id.* ¶ 5.) Arizona participates in the Electronic Registration Information Center ("ERIC"), from which it receives both "Deceased Reports" and "Retraction Reports" identifying registrants erroneously flagged as deceased. (*Id.* ¶¶ 13-32.)

On April 24, 2024, the Foundation requested all ERIC Retraction Reports and related correspondence, asserting they are records subject to disclosure under NVRA § 8(i). (*Id.* ¶ 33.) The Secretary denied access to the Retraction Reports, citing federal restrictions on Death Master File data. (*Id.* ¶ 37.) After providing notice under 52 U.S.C. § 20510(b) and receiving no cure, the Foundation filed this action alleging that the Secretary's refusal to produce the records violates NVRA § 8(i) and causes the Foundation informational and organizational harm. (*Id.* ¶¶ 38-56.) The Foundation raises two claims—each a violation

of NVRA § 8(i): failure to maintain voter-list maintenance records and failure to make voter-list maintenance records available for public inspection. (*Id.* ¶¶ 57-74.)

The Secretary then filed the present Motion to Dismiss (Doc. 15) under both Rule 12(b)(1), for lack of standing, and under Rule 12(b)(6), for failure to state a claim. That Motion is fully briefed. (Docs. 16, 18.)

## II.    STANDING

### A.    Legal Standard

Because standing implicates the Court's subject-matter jurisdiction, the analysis begins there. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction).") "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It has three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (citation modified).

"The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified).

### B.    Injury in Fact

The analysis starts with the injury in fact requirement. The Secretary argues that the Foundation failed to allege concrete and individualized harms resulting from the denial of

1    the requested information. (Doc. 15 at 6-10.) The Foundation responds that the denial of

2    public records alone satisfies informational injury, and that, even if not, it alleged sufficient

3    adverse consequences. (Doc. 16 at 7-10.)

4                     1.    <u>Informational Injury Doctrine</u>

5           The Supreme Court recognized the informational injury doctrine in *Public Citizen*

6    *v. United States Department of Justice*, 491 U.S. 440, 449 (1989), where it held that an

7    agency's denial of information required by the Freedom of Information Act—a statute with

8    a public disclosure mandate—constituted a "sufficiently distinct injury to provide standing

9    to sue." The Court extended that logic in *FEC v. Akins*, 524 U.S. 11, 11-12 (1998), holding

10   that voters who were denied documents under the Federal Election Campaign Act had

11   standing because "the informational injury at issue . . . directly related to voting, the most

12   basic of political rights."

13          But the landscape has evolved. "[M]uch has happened in standing jurisprudence

14   since *Public Citizen* and *Akins* were decided, including attempts by various courts to read

15   these cases as requiring more than just the denial of information to have standing." *Pub.*

16   *Int. Legal Found. v. Sec'y of Pa.*, 136 F.4th 456, 462 (3d Cir. 2025). The shift began with

17   *Spokeo*, 578 U.S. at 341, where the Court rejected the proposition that "a plaintiff

18   automatically satisfies the injury-in-fact requirement whenever a statute grants a person a

19   statutory right and purports to authorize that person to sue." The Court reaffirmed that point

20   in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441-42 (2021), when it rejected an expansive

21   "informational injury" theory and emphasized that the plaintiffs identified no "downstream

22   consequences" from the missing information (quoting *Trichell v. Midland Credit Mgmt.*,

23   964 F.3d 990, 1004 (11th Cir. 2020)).

24          Here, the Foundation relies heavily on *Public Citizen* and *Akins*. It argues that under

25   those cases, alleging the denial of information is enough, and it "need not demonstrate

26   additional adverse effects caused by the Secretary's actions." (Doc. 16 at 3, 6-9.) The

27   Secretary counters that the Foundation "d[id] not cite a single case decided after 2019 in

28   its standing analysis," despite *TransUnion* adding "important requirements for standing

based on alleged informational injury." (Doc. 18 at 4.)

The Ninth Circuit has acknowledged this "downstream consequences" requirement. *See Munoz v. PHH Corp.*, No. 22-15407, 2023 WL 2202228, at *1 (9th Cir. Feb. 24, 2023) (noting that *TransUnion* requires plaintiffs to show "downstream consequences" from an alleged informational injury because such an "injury that causes no adverse effects cannot satisfy Article III." (quoting *TransUnion*, 594 U.S. at 442)); *see also Pub. Int. Legal Found. v. Nago*, No. CV 23-00389 LEK-WRP, 2024 WL 3233994, at *5 (D. Haw. June 28, 2024) ("In order to possess standing pursuant to the informational injury doctrine, a party must also prove downstream consequences from their alleged informational injury because an asserted informational injury that causes no adverse effects cannot satisfy Article III." (citation modified)). The Court notes that there is debate over whether *TransUnion* imposes this "downstream consequences" requirement in cases involving "sunshine laws," statutes aimed solely at disclosure of information. *See Sec'y of Pa.*, 136 F.4th at 463-64. Several circuits read *Akins* and *Public Citizen* as involving plaintiffs who identified concrete downstream consequences—namely, a need for the requested information to participate in the electoral or judicial selection processes—rather than as establishing standing based on the denial of information alone. *See Trichell*, 964 F.3d at 1004; *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 938 (5th Cir. 2022); *Laufer v. Looper*, 22 F.4th 871, 881 (10th Cir. 2022); *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 630 n.11 (6th Cir. 2025); *Sec'y of Pa.*, 136 F.4th at 466. But as the Third Circuit recognized, that debate is of no import here because "Congress's purpose in enacting the NVRA targets an objective much broader and more expansive than access to records." *Sec'y of Pa.*, 136 F.4th at 464.

The Court therefore applies *TransUnion*. The Foundation must identify "downstream consequences," meaning concrete and particularized harm from governmental failures to disclose. *See TransUnion*, 594 U.S. at 442; *Scott*, 49 F.4th at 938. Because the Foundation alleges an informational injury, it must also show a nexus between the downstream consequence, the alleged harm, and the concrete interest Congress sought to protect. *See TransUnion*, 594 U.S. at 441-42; *Tailford v. Experian Info. Sols., Inc.*, 26

F.4th 1092, 1100 (9th Cir. 2022) (holding that in the Fair Credit Reporting Act context, non-disclosure is a concrete injury where it prevented the plaintiff from receiving "fair and accurate reporting of their credit information"); *Sec'y of Pa.*, 136 F.4th at 465 (noting that plaintiffs "must establish a nexus among a downstream consequence, his alleged harm, and the interest Congress sought to protect. Without such a nexus, a plaintiff can claim no informational injury standing.").

### 2.    Analysis

The question, then, is whether the Foundation has alleged downstream consequences that are concrete and particularized and actual or imminent, and whether those consequences connect to the NVRA's purposes. "The NVRA's purposes include 'protect[ing] the integrity of the electoral process,' 'ensur[ing] that accurate and current voter registration rolls are maintained,' and 'establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office.'" *Mi Familia Vota v. Fontes*, 129 F.4th 691, 717 (9th Cir. 2025) (quoting 52 U.S.C. § 20501(b) (alterations in original)).

The Foundation's complaint identifies several downstream injuries. (Doc. 1 ¶¶ 50-55.) It first alleges that the Secretary's denial prevents it "from evaluating Arizona's compliance with state and federal voter list maintenance obligations." (*Id.* ¶ 51.) It next asserts that the refusal to disclose records hinders its ability to "propos[e] best practices and solutions that will assist Arizona in carrying out its voter list maintenance programs and activities and help ensure Arizona's voter roll is accurate and current." (*Id.* ¶ 52.) The Foundation also claims that it is prevented "from speaking (and educating) about matters of public importance—namely, erroneous disenfranchisement of voters and voter roll accuracy," pointing to testifying before Congress and policy advice to state officials. (*Id.* ¶ 53.) Finally, it contends that the denial "frustrates the Foundation's accumulation of current and timely institutional knowledge," impeding "its efforts to carry out its organizational mission." (*Id.* ¶¶ 54-55.)

The Secretary relies on recent decisions from the Third and Sixth Circuits involving

the same plaintiff, where those courts rejected informational-injury claims under the NVRA. (Doc. 18 at 5-6.) In *Secretary of Pennsylvania*, the Foundation sought records under the NVRA's public-inspection provision and sued after the Secretary of the Commonwealth declined to produce them. 136 F.4th at 459. To establish standing, the Foundation alleged three adverse consequences: it could not study the Secretary's list-maintenance activities, its ability to disseminate educational materials was frustrated, and it expended time and resources seeking the records. *Id.* at 467.

The Third Circuit nevertheless held that the Foundation lacked standing because it failed to explain how its inability to study and analyze the records limited its own participation in the electoral process or the expansion of voter participation in federal elections. *Id.* The court also emphasized that the Foundation had no ties to Pennsylvania or its voters. *Id.* And because the case was decided on cross-motions for summary judgment, the court focused on the absence of record evidence showing any specific plans for using the requested records in ways tied to the NVRA's purposes. *Id.* at 468.

Similarly, in *Benson*, the Foundation sought comparable records under the NVRA and sued the Michigan Secretary of State after being denied access. 136 F.4th at 621. The Foundation asserted standing on two theories: that it was prevented from engaging in its research, educational, and remedial activities, and that the denial impaired its accumulation of institutional knowledge necessary to carry out its core operations. *Id.* at 631. The Sixth Circuit rejected those theories as insufficient, emphasizing that the alleged harms were speculative and unsupported by evidence of specific projects, publications, or outreach efforts. *Id.* The court's analysis again reflected the summary-judgment posture of the case. *Id.*

This case is different in two respects. First, the Court evaluates standing at the motion to dismiss stage, where the inquiry is limited to the sufficiency of the allegations, not the evidentiary record. "At the motion to dismiss stage, the bar to allege standing is not high." *Powers v. McDonough*, 713 F. Supp. 3d 695, 728 (C.D. Cal. 2023), *aff'd*, 2025 WL 3718737 (9th Cir. Dec. 23, 2025); *cf. Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 633, 636

(9th Cir. 2025), *cert. denied*, No. 24-1326, 2025 WL 2823837 (U.S. Oct. 6, 2025) (holding that a plaintiff adequately established Article III standing based on a concrete injury even where the alleged harm was modest).

Because standing is a jurisdictional inquiry distinct from the merits, courts may not import the plausibility analysis of *Twombly* and *Iqbal* into the standing analysis. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). Instead, at this stage, the Court accepts the Foundation's well-pleaded factual allegations as true and asks only whether those allegations suffice to establish Article III standing—not whether the Foundation can ultimately prove its claims. *See Lujan*, 504 U.S. at 561 ("[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage because courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim.").

Second, the Foundation here pleads downstream consequences with more particularity than it did in *Secretary of Pennsylvania* and *Benson*. The Foundation identifies specific categories of reports it prepares aimed at proposing best practices for voter registration integrity and alleges that denial of the records prevents it from providing policy advice and testimony to state officials and Congress. (Doc. 1 ¶¶ 52-53.) Those alleged harms are particularized to the Foundation because they affect the Foundation's own activities, not a generalized public interest. They are concrete because they involve the inability to produce specific work product (reports, testimony, policy recommendations) that the Foundation alleges it would otherwise create. And they are actual and not hypothetical because the Foundation alleges it sought the records, was denied, and cannot now complete the work it intended to do with them.

Moreover, the Foundation's alleged injuries bear a sufficient nexus to the NVRA's purposes. The statute aims to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). The Foundation alleges that the ERIC Retraction Reports concern voters who may have been erroneously removed from the rolls. (Doc. 1 ¶¶ 27-28.) The

Foundation therefore advances that this information is relevant to ensuring accurate voter rolls and protecting eligible voters from erroneous disenfranchisement. (*Id.* ¶ 53.)

The Foundation's alleged inability to analyze that data and advocate for corrective measures implicates the NVRA's objectives. As Judge Ho observed in *Scott*, an informational injury under the NVRA's public disclosure provision may exist where "the information is necessary to engage in public advocacy about a pressing matter of policy" or where it is "essential to furthering Plaintiffs' mission to protect the voting rights of various communities." 49 F.4th at 940 (Ho, J., concurring). The Foundation's allegations track those considerations: it claims the records are necessary for advocacy on election administration policy and for protecting voters who may have been wrongly removed from the rolls. (Doc. 1 ¶¶ 51-53.) At this stage, the Court need not assess the ultimate merits or evidentiary support for those claims. *See Maya*, 658 F.3d at 1068 ("[T]he threshold question of whether plaintiff has standing (and the court has jurisdiction) is distinct from the merits of his claim."); *Cath. League for Religious & Civ. Rts. v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) ("Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true.").

The Foundation has alleged downstream consequences that are concrete, particularized, and actual, and that bear a plausible connection to the interests the NVRA was enacted to protect. That is sufficient to survive a motion to dismiss.

## C.    Traceability and Redressability

The Secretary also argues that any alleged injury is not fairly traceable to his conduct and would not be redressed by a favorable decision because federal law, rather than the Secretary, prevents disclosure of the requested records. (Doc. 18 at 8-9.) This argument conflates the merits with standing. The Complaint alleges that the Secretary, as Arizona's chief election official, denied the Foundation's request for records that the NVRA requires to be made available for public inspection. (Doc. 1 ¶¶ 5, 32-37.) That refusal is the

immediate cause of the Foundation's asserted informational injury. *See Feathers v. On Q Fin. LLC*, No. CV-24-00811-PHX-SMB, 2025 WL 1769764, at *7 (D. Ariz. June 26, 2025) (holding that to prove standing, "[a] plaintiff's allegation must simply show that defendant's acts caused or contribute[d] to the kinds of injury alleged, which renders the 'fairly traceable' standard lower than that of pleading tort causation"). Whether federal law justified or required that denial is a merits question.

For similar reasons, the Foundation has adequately alleged redressability. The Foundation seeks declaratory and injunctive relief compelling compliance with the NVRA (Doc. 1 at 13); if granted, that relief would remedy the alleged denial of information. *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (holding that redressability is satisfied if the requested remedy "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002))). The Secretary argues that the Court cannot order him to violate federal law, so no remedy is available. (Doc. 18 at 9.) But this again assumes the answer to the merits question. The Foundation contends that disclosure would not violate federal law—either because the ERIC Retraction Reports do not contain protected information or because any conflict between the statutes can be harmonized through appropriate redactions. (Doc. 16 at 12, 16-17.) If the Foundation is correct, judicial relief is available. The possibility that the Secretary might prevail on the merits does not defeat redressability at the pleading stage. *See Maya*, 658 F.3d at 1068.

Whether other federal statutes ultimately constrain disclosure bears on the merits, not Article III standing, and does not defeat traceability or redressability at this stage. Accordingly, the Court finds that the Foundation has adequately alleged Article III standing.

## III.     FAILURE TO STATE A CLAIM

### A.     Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim."

*Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A court may dismiss a complaint "if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (citation modified).

A complaint must assert sufficient factual allegations that, when taken as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility is more than a mere possibility; a plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. When analyzing the sufficiency of a complaint, the well-pled factual allegations are taken as true and construed in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

### B.    Analysis

The Secretary contends that, even if the Foundation has standing, the Complaint fails to state a claim because federal law prohibits disclosure of information derived from the Limited Access Death Master File ("LADMF"). (Doc. 15 at 13-14.) According to the Secretary, the ERIC Retraction Reports contain Social Security Administration death data protected by 42 U.S.C. § 405(r) and 15 C.F.R. Part 1110, and disclosure would expose him to liability. (*Id.* at 14.) The Secretary therefore frames the dispute as a pure question of statutory interpretation that the Court may resolve at the pleading stage. (*See id.* at 15-16; Doc. 18 at 10.)

The Foundation disagrees, arguing that "whether any data in the ERIC Retraction Reports falls within the LADMF's protection is a factual question that cannot be resolved at this stage." (Doc. 16 at 14.) It maintains that Retraction Reports identify individuals who have been determined *not* to be deceased and therefore do not contain "death information" within the LADMF framework. (*Id.* at 12-14.)

Although the Complaint does not expressly allege that ERIC Retraction Reports contain no LADMF-derived data, it does allege that those reports are "subject to disclosure

under the NVRA's Public Disclosure Provision." (Doc. 1 ¶¶ 26, 32.) The Complaint also pleads that the Secretary uses ERIC Retraction Reports to correct erroneous list-maintenance actions—specifically, to reinstate voters incorrectly flagged as deceased—and thus to implement Arizona's voter list maintenance program. (*See id.* ¶¶ 21-25, 31.) From those factual allegations, it is reasonable to infer that the Retraction Reports constitute records "concerning the implementation of programs and activities" to ensure accurate voter rolls under NVRA § 8(i).

At the pleading stage, the Court must accept well-pleaded factual allegations as true and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678-79. The Secretary's LADMF defense turns on factual questions not apparent from the face of the Complaint—specifically, whether the ERIC Retraction Reports contain information derived from the LADMF and, if so, which data fields are implicated. Because those questions turn on the contents, sources, and use of the reports, they present factual disputes that cannot be resolved on a motion to dismiss. *See Barrionuevo v. Chase Bank, N.A.*, 885 F. Supp. 2d 964, 974 (N.D. Cal. 2012) ("At the Rule 12(b)(6) stage, given the factual uncertainties underlying the parties' arguments, Plaintiffs' claim is sufficient to withstand a motion to dismiss."); *Jones v. Bank of Am., N.A.*, No. CV 18-5631 FMO (JEMx), 2020 WL 4819699, at *5 (C.D. Cal. Mar. 16, 2020) ("[F]actual dispute[s] cannot be resolved at the motion to dismiss stage.").

Courts confronting the same dispute have taken a similar approach. In *Public Interest Legal Foundation, Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1016 (D. Alaska 2023), the district court acknowledged that "to the extent ERIC used the Limited Access Death Master File to create the data that is at issue in this case, the Bipartisan Budget Act of 2013 prevents disclosure of that data for a three-year period beginning after the death of an individual." But the court declined to resolve, at the motion-to-dismiss stage, whether ERIC in fact used LADMF data. *Id.* Instead, it held that the Foundation plausibly alleged that ERIC data falls within NVRA § 8(i) because the State's review of ERIC data constitutes an "activity" or "program" implemented to ensure the accuracy and currency of

- 12 -

1   voter rolls. *Id.* at 1014. The court further observed that any potential conflict between the

2   NVRA and federal privacy statutes "likely can be harmonized by requiring the exclusion

3   of sensitive personal information in the Death Master File from the scope of the NVRA's

4   disclosure provision," and allowed the case to proceed to discovery. *Id.* at 1016.

5           The District of Colorado reached the same conclusion. *See Pub. Int. Legal Found.*

6   *v. Griswold*, No. 21-CV-03384-PAB-MEH, 2023 WL 6376706, at *6 (D. Colo. Sept. 29,

7   2023). There, the court declined to dismiss the Foundation's complaint where alleged

8   conflicts between the NVRA and LADMF-based privacy restrictions were "too fact based

9   for a motion to dismiss" and could potentially be addressed through tailored redactions. *Id.*

10          The Court follows that reasoning here. Because the Foundation has plausibly

11  alleged that the Retraction Reports are subject to disclosure under NVRA § 8(i), dismissal

12  under Rule 12(b)(6) is unwarranted. Whether federal law ultimately limits or conditions

13  disclosure is a question for a later stage of the litigation, not a basis for dismissal at the

14  outset. The Court will therefore deny the motion to dismiss.

15  **IV.    CONCLUSION**

16          **IT IS THEREFORE ORDERED denying** the Secretary's Motion to Dismiss

17  (Doc. 15) without prejudice.

18          **IT IS FURTHER ORDERED** that a Rule 16 Scheduling Conference will be set

19  by separate order.

20          Dated this 5th day of January, 2026.

21

22

23                                          *Michael T. Liburdi*

24                                      Michael T. Liburdi
                                        United States District Judge
25

26

27

28